747 A.2d 255

PIA MANCUSO AND LENNY MANCUSO, HER HUSBAND, PLAIN-
TIFFS–APPELLANTS, v. SPERO NECKLES, M.D., BY PETER J.
NECKLES, ADMINISTRATOR OF THE ESTATE OF SPERO
NECKLES; KARL G. KLINGES, M.D., DAVID G. BUTLER, M.D.,
JAMES C. VAN ELSWYK, M.D., SPERO NECKLES, M.D., PRO-
FESSIONAL ASSOCIATION ALSO KNOWN AS DRS. KLINGES,
BUTLER, VAN ELSWYK, NECKLES, P.A.; HERBERT A. GOLD-
FARB, M.D.; HERBERT A. GOLDFARB M.D., P.A.; MONT-
CLAIR IMAGING CENTER; STEVEN SIRECI, M.D. AND JOHN
DOE 6 THROUGH 7 (BEING FICTITIOUS NAMES, TRUE
NAMES PRESENTLY UNKNOWN), DEFENDANTS, AND CLIF-
FORD BEINART, M.D., DEFENDANT–RESPONDENT.

Argued November 8, 1999—Decided February 16, 2000.

*Alfred D. Dimiero*, argued the cause for appellants (*Mella and Dimiero*, attorneys).

*William S. Mezzomo*, argued the cause for respondent (*McDonough, Korn, Eichhorn & Boyle* attorneys; *James R. Korn*, of counsel).

*William L. Gold*, submitted a brief on behalf of *amicus curiae*, Association of Trial Lawyers–New Jersey (*Brown & Gold*, attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal and that in *Gallagher v. Burdette–Tomlin Medical Hospital*, 163 *N.J.* 38, 747 *A.*2d 262 (2000), also decided today, present difficult exercises in the application of the discovery rule. Each case arises in the context of a claim for medical malpractice.

"The history and principles underlying the discovery rule have been examined by us on numerous occasions." *Abboud v. Viscomi*, 111 *N.J.* 56, 62, 543 *A.*2d 29 (1988)(citing *Vispisiano v. Ashland Chem. Co.*, 107 *N.J.* 416, 425–27, 527 *A.*2d 66 (1987)).

> Suffice it to say that the rule's "essential purpose * * * is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." [*Vispisiano, supra*, 107 *N.J.*] at 426, 527 *A.*2d 66. Accordingly, the doctrine "postpon[es] the accrual of a cause of action" so long as a party reasonably is unaware either that he [or she] has been injured, or that the injury is due to the fault or neglect of an identifiable individual or entity. *Id.* at 426–27, 527 *A.*2d 66; *accord Lynch v. Rubacky*, 85 *N.J.* 65, 70, 424 *A.*2d 1169 (1981); *Lopez v. Swyer*, [62 *N.J.* 267, 274, 300 *A.*2d 563 (1973) ]. Once a person knows or has reason to know of this information, his or her claim has accrued since, at that point, he or she is actually or constructively aware "of that state of facts which may equate in law with a cause of action." *Burd v. New Jersey Tel. Co.*, 76 *N.J.* 284, 291, 386 *A.*2d 1310 (1978).
>
> [*Abboud v. Viscomi, supra*, 111 *N.J.* at 62–63, 543 *A.*2d 29.]

The linchpin of the discovery rule is the unfairness of barring claims of unknowing parties. Statutes of limitations are primarily statutes of repose. They are designed to stimulate litigants to pursue their actions diligently.

> They penalize dilatoriness and serve as measures of repose. * * * When a plaintiff knows or has reason to know that he [or she] has a cause of action against an identifiable defendant and voluntarily sleeps on his [or her] rights so long as to permit the customary period of limitations to expire, the pertinent considerations of individual justice as well as the broader considerations of repose, coincide to bar his [or her] action. Where, however, the plaintiff does not know or have reason to know that he [or she] has a cause of action against an identifiable defendant until after the normal period of limitations has expired, the considerations of individual justice and the considerations of repose are in conflict and other factors may fairly be brought into play.
>
> [*Farrell v. Votator Div. of Chemetron Corp.*, 62 *N.J.* 111, 115, 299 *A.*2d 394 (1973) (citation omitted).]

To reach a just accommodation of these considerations, courts have developed the so-called "discovery" principle adopted first in

New Jersey in *Fernandi v. Strully*, 35 *N.J.* 434, 173 *A.*2d 277 (1961).

## I

The facts of the case are more fully set forth in the opinion of the Appellate Division reported at 316 *N.J.Super.* 128, 719 *A.*2d 716 (App.Div.1998). The plaintiff, Pia Mancuso, is a breast cancer victim whose relevant mammography history began in 1988 when she was thirty-seven-years-old. Because her breast cancer was not timely diagnosed until 1992, she has had to undergo bone marrow transplants and debilitating radiation therapy. Her chance of surviving the cancer may have been reduced. Plaintiff asserts that she had no reason to be aware until April 1996 that a mammogram taken in 1989 may have been misread. In 1996, she was alerted to that misreading by an expert report prepared for a defendant in this case. As a result, plaintiff contends that her malpractice claim filed within two years of that date in 1996 was within the two-year statute of limitations. Here is the time line in summary form:

| Date | The Medical Procedures or Legal Steps Taken | The Indicators to the Patient of Fault or Neglect of a Treating Doctor |
|---|---|---|
| 1988/1989 | The patient, Pia Mancuso, undergoes two routine mammograms. The radiologist, Dr. Beinart, reads them as showing a benign cyst in the patient's right breast. | None. |
| 1991 | The patient has a mammogram anticipatory to an hysterectomy. The patient arranges to have the 1988/1989 films sent to Dr. Sireci, the radiologist interpreting the 1991 | None. The patient was not informed of any abnormalities in the mammogram films or of the advice to Dr. Neckles. |

film. Dr. Sireci interprets the 1991 film and reviewed the 1988/1999 films for comparison. The radiologist observes, in the 1991 films,"ovoid densities" (nodules or lesions) in the patient's right breast and cautions the surgeon, Dr. Neckles, to order follow-up studies within four months.

| | | |
|---|---|---|
| July 1992 | The patient has a mammogram that discloses the onset of cancer. The radiologist's report indicated that the cyst identified in the 1988/1989 films had not changed but that a disturbance in the same area revealed suspected malignancy. Later tests revealed that the tumor was cancerous and had spread to the lymph nodes. | None. |
| December 1992 | Because of the extent of her tumor and its spread, the patient endures bone marrow transplant and months of chemotherapy. | For the first time, the patient learns of the abnormalities shown in the 1991 pre-hysterectomy film and the radiologist's recommendation of a four-month follow-up. |
| June 1993 | The patient consults an attorney because of her concern about Dr. Neckles' failure to follow up. | |

| | | |
|---|---|---|
| June 1994 | The attorney submits all the patient's medical reports to a qualified medical expert. | The expert reports that medical malpractice took place in 1991 when Dr. Neckles failed to order follow-up studies. |
| July 1994 | The attorney files suit against Dr. Neckles (the physician identified by the patient's expert as the physician whose fault had caused the patient's cancer to spread), his medical partners and a number of John Doe defendants. | No indication of fault other than on the part of Dr. Neckles whom the patient has sued within the two years of D |
| April 1996 | Dr. Neckles' expert witness submits a report that expresses an opinion that the 1989 mammogram showed a possible malignancy. | The patient for the first time is informed that Dr. Beinart may have failed to read the 1989 mammogram correctly. |
| November 1996 | July 1997 The patient's attorney retains a new expert who reports that a possible malignancy was evident in the 1989 mammographic films and that Dr. Beinart who interpreted the films "deviated from accepted standards of radiological care." | |
| July 1997 | The patient files an amended complaint to include Dr. Beinart as an added defendant. | |

## II

The trial court dismissed plaintiff's complaint against Dr. Beinart on the basis that the statute of limitations had run. The Appellate Division affirmed the Law Division's ruling, concluding, that:

> A reasonable person in plaintiff's position should have been aware that her expert's opinion was not necessarily the last word on the subject of who might have done her wrong. In 1992, plaintiff knew of her injury, the increase in the cancer caused by a delayed diagnosis, and she knew that it had been possibly caused by the negligence of another. A reasonable person would have appreciated that the universe of possible others included any of the radiologists who had read the mammograms. Dr. Beinart was clearly within that universe. Although plaintiff did not know him by name, she had his reports and mammograms, and she could have as easily identified him by name in 1992 or 1993 as she did in 1997.

> [*Mancuso, supra,* 316 *N.J.Super.* at 134–35, 719 *A.*2d 716.]

In reviewing the precedential value of the *Mancuso* decision, the Appellate Division panel in *Gallagher,* reasoned otherwise:

> Mrs. Mancuso was not a physician or a radiologist and had no particular skill or ability to read a mammogram. She also had absolutely no symptoms following the original mammograms. When, several years later, she found that her cancer was advanced, she went to a lawyer in a timely fashion and engaged an expert to review her records, including the 1988 and 1989 mammograms to determine whether her injury was the fault of another. Her expert found malpractice in the 1991 interpretation but none in the 1988 and 1989 readings. Mrs. Mancuso thus had absolutely no reason to doubt the 1988 and 1989 mammograms which were not followed by any symptoms, and which were taken and interpreted by one expert and found by a different expert, hired for litigation purposes, to be beyond reproach.

> [318 *N.J.Super.* 485, 498–99, 723 *A.*2d 1256 (1999).]

## III

The question for decision is which is the correct application of the discovery rule. The guiding principles for decision were perhaps best set forth in *Vispisiano, supra,* 107 *N.J.* 416, 527 *A.*2d

66. Justice Clifford, a watchful guardian of consistency in the Court's discovery rule doctrine, concurred in the substantive analysis set forth in that opinion. *Id.* at 438, 527 *A.*2d 66 (Clifford, J., concurring). The Court explained that so long as

the appropriate time for accrual of a cause of action for "discovery rule" purposes is when "the injured party discovers, or by the exercise of reasonable diligence and intelligence, should have discovered[,] that [he or she] may have a basis for an actionable claim," *Lopez v. Swyer, supra,* 62 *N.J.* at 272, 300 *A.*2d 563, then the nature of the information necessary and the quality of the requisite state of mind will[,] of course[,] vary from case to case, and more than that, from type of case to type of case.

[*Id.* at 434, 527 *A.*2d 66.]

This "type of case" involving medical malpractice requires special focus on the "nature of the information" possessed by the claimant. *Vispisiano* explained that cases of complex medical causation are quite unlike cases in which injury and cause are self-evident, as when a record press machine malfunctions and crushes a worker's hand. *Ibid.* (citing *Viviano v. CBS, Inc.,* 101 *N.J.* 538, 503 *A.*2d 296 (1986)). In cases of complex medical causation, it is not at all self-evident that the cause of injury was "(a) the fault of (b), a third party. Not only is the nature of the injury generally unclear, its very existence is frequently masked." *Ibid.* In that context of masked injury and complex causation more is required than suspicion—"in the sense of an uninformed guess or of speculation without some reasonable medical support—of a causal connection between a physical condition and chemical exposure [to start] the running of the statute of limitations. . . ." *Ibid.*

In order to start the statute of limitations running in this context of medical malpractice, more is required than mere speculation or an uninformed guess "without some reasonable medical support" that there was a causal connection between Pia Mancuso's condition and Dr. Beinart's conduct.

The *Vispisiano* Court drew a parallel to *Mancuso v. Mancuso,* 209 *N.J.Super.* 51, 506 *A.*2d 1253 (App.Div.1986). In that case, the Appellate Division reasoned that the relationship between trauma and the onset of Parkinson's Disease "is a matter of such highly specialized medical knowledge that plaintiff cannot be

reasonably chargeable with not having made that connection until she was so advised by the Lahey Clinic neurologist just a month after the running of the statute." *Id.* at 58, 506 *A.2d* 1253.

By this, the *Vispisiano* Court did not mean to suggest that the plaintiff must have an expert report in hand before the statute of limitations will commence to run. *See Burd, supra,* 76 *N.J.* at 298–99, 386 *A.2d* 1310 (Pashman, J., dissenting). Rather, the Court simply wished to stress the nature of the information available to the injured party. Thus, for example, in *Apgar v. Lederle Lab.,* 123 *N.J.* 450, 455, 588 *A.2d* 380 (1991), the Court held time-barred the claim of one who knew that her teeth had been discolored and, based on information from several dentists (reasonable medical support), surmised that the medication that she had taken as a child had caused the staining.

■ Applying these principles, we are satisfied that Pia Mancuso was reasonably unaware, until the 1996 deposition, that her injury was possibly due to the fault of Dr. Beinart. The "nature of the information" that she possessed did not suggest that the spread of her cancer may have been due to the fault of Dr. Beinart. In fact, two sets of medical professionals had confirmed that Dr. Beinart's initial diagnosis of a benign cyst in her right breast was correct. Indeed, Pia Mancuso received years of post-operative care from physicians at the world renowned Memorial Sloan Kettering Cancer Center. Not one of those physicians alerted her to the possibility of fault on behalf of Dr. Beinart. The "quality of the requisite state of mind" that she possessed appeared blameless. Unlike the plaintiff in *Apgar, supra,* Pia Mancuso did not suspect, much less have reason to believe, that she may have been injured by the conduct of Dr. Beinart.[1]

---

[1] The fictitious defendant rule does not apply in this setting. That rule applies when one reasonably suspects that others (such as the manufacturers of a component part) may have injured him or her but simply does not know the name of the person or party suspected.

We have construed *Rule* 4:26–4 to permit a plaintiff who institutes a timely action against a fictitious defendant to amend the complaint after the

We thus agree that, as in *Lynch v. Rubacky, supra,* "the shortcoming of the determination [of the court] below rests not so much upon the facts as determined by the trial court as upon the legal significance of those facts under the discovery rule." 85 *N.J.* at 70, 424 *A.*2d 1169; *see also Vispisiano v. Ashland Chem. Co., supra,* 107 *N.J.* at 432, 527 *A.*2d 66 (indicating that the Court's "disagreement with the trial court ... [was] not directed at its findings of fact but rather at the significance to be attached to those facts.").

Statutes of limitation "penalize dilatoriness and serve as measures of repose." *Farrell, supra,* 62 *N.J.* at 115, 299 *A.*2d 394. Plaintiff was not dilatory. Plaintiff did "not know or have reason to know that [she] ha[d] a cause of action against an identifiable defendant until after the normal period of limitations had expired." *Ibid.* Could or should she have insisted that her attorney seek further experts, and if so, how many? Lawyers retaining expert witnesses do not target the expert on a particular defendant, theory or cause of action. They seek the best advice possible. Both plaintiff and her attorney were then constrained under the Rules of Professional Conduct stating that "[a] lawyer shall not bring or defend a proceeding, nor assert or controvert an issue therein unless the lawyer knows or reasonably believes that there is a basis for doing so that is not frivolous...." *R.P.C.* 3.1. Parties must also comply with the "Frivolous Litigation Statute." *N.J.S.A.* 2A:15–59.1 penalizes parties conducting "frivolous litigation" and compensates those parties victimized by such actions

---

expiration of the statute of limitations to identify the true defendant. In so construing the Rule, we recognized that an amended complaint identifying the defendant by its true name relates back to the time of filing of the original complaint, thereby permitting the plaintiff to maintain an action that, but for the fictitious-party practice, would be time-barred.
[*Viviano v. CBS, Inc.,* 101 *N.J.* 538, 548, 503 *A.*2d 296 (1986) (citing *Farrell v. Votator Div. of Chemetron Corp.,* 62 *N.J.* 111, 120–23, 299 *A.*2d 394 (1973)).]
The identification of the defendants in this case was always known to plaintiff and therefore, the rule does not come into play.

brought "in bad faith, for the purpose of delay and harassment." *Deutch & Shur, P.C. v. Roth,* 284 *N.J.Super.* 133, 139, 663 *A.*2d 1373 (Law Div.1995).

That ethical requirement of a good faith belief in an actionable claim is reinforced by the recent enactment of the Affidavit of Merit Statute. *N.J.S.A.* 2A:53A–27. Within 60 days of filing a professional malpractice action, a plaintiff must "provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices." *Alan J. Cornblatt, P.A. v. Barow,* 153 *N.J.* 218, 228, 708 *A.*2d 401 (1998). Thus, in addition to filing the action within two years of its accrual, a claimant must also have in hand or be able to obtain within 60 days the expert's opinion pursuant to the Affidavit of Merit Statute; otherwise, the claim is precluded. Realistically, most attorneys and parties will want to have the report in hand before filing the suit.

▆▆▆ We are thus satisfied that when a patient has relied on competent expert advice that one or more of her treating physicians did not contribute to the patient's injuries, later assertions to the contrary by a competent expert would then provide the "basis for an actionable claim." *Lopez, supra,* 62 *N.J.* at 272, 300 *A.*2d 563. Of course, this is but the start, not the end of the inquiry. In order to apply the discovery rule, it must be shown that a defendant has not been unfairly prejudiced by the delay. *Id.* at 276, 300 *A.*2d 563.

> It may ... be unjust ... to compel a person to defend a law suit long after the alleged injury has occurred, when memories have faded, witnesses have died and evidence has been lost. After all, statutes of limitations are statutes of repose and the principal consideration underlying their enactment is one of fairness to the defendant.
>
> [*Id.* at 274, 300 *A.*2d 563.]

In this case, because the claim involves the proper interpretation of mammographic films, we are satisfied that the requisite finding

of no prejudice is made. The issue is quite discrete and involves the analysis or reading of x-ray photographs already in existence. Although Dr. Neckles has died, his testimony is not crucial to this inquiry.

The judgment of the Appellate Division is reversed. Plaintiff's complaint is reinstated. The matter is remanded to the Law Division.

*For reversal; reinstatement and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN and VERNIERO—6.

*Opposed*—None.